OPINION OF THE COURT
James B. Canfield, J.
Plaintiff infant claims that he was injured by exposure to lead-based paint in premises owned by the Milanos, as a result of the defendants’, Letterio Milano and Stefana Milano (Milanos) and the County of Rensselaer (County), negligence. He first asserts that peeling paint on the walls and ceilings gave the Milanos constructive notice that there was a lead hazard prior to plaintiff’s entering the apartment and they are therefore liable for injuries suffered as a result of lead exposure during the period of plaintiff’s highest verified lead levels. Plaintiffs second claim against the Milanos is that they were given actual notice of the lead hazard by plaintiffs father in late May 1989 after plaintiff was tested and failed to remediate. The Milanos’ maximum liability on the second “post-test/ post-inspection” claim is reduced to injury suffered solely as a result of alleged lead exposure occurring after they were made aware of the test results during a period of time when plaintiffs lead level was generally declining. Plaintiffs claim against the County rests on allegations that the County negligently failed to follow the proper protocols in dealing with the danger posed by plaintiffs lead levels during the “post-test/post-inspection” period and failed to inform the Milanos of the lead problem thereby allegedly causing the Milanos to believe that there was no problem and to fail to remedy the problem.
Defendants move and cross-move for summary judgment dismissing the infant plaintiffs action, challenging not only plaintiffs alleged injuries, but whether the disorders are lead related, and whether defendants caused any lead-related injuries that plaintiff suffered. Defendants seek to shift responsibility to plaintiff for alleged non-lead-related disorders and to plaintiffs parents for both non-lead-related symptoms and for plaintiffs lead exposure during periods for which defendants disclaim responsibility for lead exposure. In his motion to dismiss plaintiff first argues he was too young while a resident at the Milanos’ apartment to be held accountable for his own actions (Galvin v Cosico, 90 AD2d 656; Yun Jeong Koo v St. Bernard, 89 Misc 2d 775, 777). Defendants do not seek to hold plaintiff accountable for chewing on the window sill or *490 ingesting lead chips as an infant, but seek to prove that his present condition is not the result of his exposure to lead and to hold him accountable for his subsequent conduct which allegedly caused or exacerbated his present condition. As amplified by the papers, the defendants urge that some of the symptoms plaintiff complains of are inherited disorders, and that others are behaviors he has control over and uses voluntarily to manipulate those around him. Other disorders allegedly result from plaintiff’s own choices. The court finds that defendants are entitled to dispute plaintiff’s claims by presenting evidence that plaintiff is not suffering from lead-related illness and denies the motion to dismiss counterclaims against the plaintiff, leaving it to a fact finder to determine whether or not plaintiff has or caused the injuries he allegedly suffers.
Plaintiff also cross-moves to dismiss defendants’ affirmative defenses against plaintiff’s parents. Plaintiff’s effort to bar defendants from disputing causation and the fact of injury under the guise of opposing “negligent supervision” counterclaims (Holodook v Spencer, 36 NY2d 35) appears to be a matter of first impression. Given the plaintiff’s normal to high intelligence and fortunate lack of the other typical lead-related disorders, defendants deny that he was injured by the lead exposure and ascribe plaintiff’s present behavior problems to other factors. Defendants claim the parents’ behavior caused some of the disorders plaintiff mistakenly claims are lead related. For example, the record reveals that the parents failed to obtain any prenatal or routine pediatric care for plaintiff during his first year and a half while they shifted around the country, living in condemned buildings, homeless shelters, and a pup tent and that plaintiff was exposed to verbal and physical abuse and alcoholism throughout his early years. To the extent there are periods of lead exposure for which defendants are not responsible, the parents’ actions may also be a relevant basis for challenging plaintiff’s claim that defendants caused any lead-related injury. Heretofore, negligent supervision has not been used to preclude defendants from challenging causation or injury (see, LaTorre v Genesee Mgt., 90 NY2d 576; Holodook v Spencer, supra; Navaro v Ieraci, 214 AD2d 713; Ramesar v Surooj, 221 AD2d 612; Latta v Siefke, 60 AD2d 991, 992). Plaintiff has presented no convincing argument for extending the rule to encompass such defenses.
To the extent that defendants are seeking to use negligent supervision as a defense to lead exposure during periods when they are also liable, plaintiff’s objection is appropriate. The *491 “negligent supervision” rule protects infants against tortfea-sors who would avoid paying damages for their own negligence by pointing to the nearly ever-present negligent supervision of the infants’ parents (Holodook v Spencer, 36 NY2d 35, 49, supra). Although parents’ negligent failure to supervise a child is sometimes referred to as “nonactionable” (e.g., LaTorre v Genesee Mgt., supra, at 578), infants may commence tort actions against their parents (Gelbman v Gelbman, 23 NY2d 434) and it is more accurate to say negligent supervision is only “generally” not a tort actionable by the child (LaTorre v Genesee Mgt., supra, at 579). Consequently, it is also only “generally” unavailable to defendants as a basis for seeking contribution.
This case provides an opportunity for considering the applicability of the general “negligent supervision” rule (LaTorre v Genesee Mgt., supra, at 584) in the context of on-going lead exposure where the infant’s parents know the danger posed by continued exposure to lead and the means for eliminating that exposure. Plaintiffs “post-test/post-inspection” lead exposure claims against the Milanos and the County highlight the marked difference between this case and the typical “negligent supervision” case in which a parent is not keeping an eye on the child who unexpectedly darts out into traffic or a parent fails to buckle the child’s seatbelt before their car is struck by another motorist. Not only does lead exposure occur over an extended period, but in this case defendants’ alleged liability stems from their failure to act at a time when plaintiffs parents, after being made aware of plaintiffs high lead level and the simple means by which they could reduce his exposure, not only failed to take those recommended actions but actually blocked the landlord’s access to the apartment, thereby eliminating any chance that the landlord could eliminate the lead. Plaintiffs mother admits being informed by a County employee shortly after the first blood test when the apartment was first inspected that under the fresh paint on the woodwork there was lead-based paint and of the importance of taking precautions such as removing the lead-based paint or repainting or taping over the lead-based paint plaintiff had uncovered, sweeping or vacuuming up dust and chips, and washing plaintiffs hands and toys. Plaintiffs parents did not follow these precautions, and instead changed the apartment locks and denied the Milanos access to the premises. It is significant that within two months of the parents’ first warning and notice regarding how to reduce lead exposure, the mother brought *492 plaintiff to the hospital for “lead shock” and the doctor examining plaintiff told her that she “should get out of the apartment.” Instead of leaving as advised, plaintiff’s parents continued to refuse to leave the apartment, failed to clean up the paint chips or seal the exposed lead paint, as confirmed by the later inspection of the apartment, and thereby prolonged plaintiff’s lead exposure for almost all of the “post-test/post-inspection” period during which plaintiff now attempts to hold the Milanos and County responsible for failing to protect him from lead exposure.
The Court of Appeals declared that the “sound rule of the Holodook case survives only if accompanied by sound exceptions” (Nolechek v Gesuale, 46 NY2d 332, 341) and that given the impossibility of stating “ ‘an exact rule’ ” to govern negligent supervision claims, the appropriate judicial course is “step-by-step common-law incrementalism” (LaTorre v Genesee Mgt., supra, at 583). In finding one such exception, the Court of Appeals noted that it is “ ‘not necessary that the [parent] should have had notice of the particular method in which an accident would occur, if the possibility of an accident was clear to the ordinarily prudent eye’ ” (Nolechek v Gesuale, supra, at 340).
The facts in this case are far more compelling. The reckless parent in Nolechek (supra) did not know how his son’s accident would occur, while plaintiff’s parents did and acted to prolong his lead exposure anyway. Where the specific danger is imminent and patently foreseeable, or as here, the parent is made aware of the danger that their infant faces, but takes steps that expose the child anyway, the parent’s negligence is actionable and requires an exception to the general application of the “negligent supervision” rule (LaTorre v Genesee Mgt., supra, at 582, 583, 584).
Accordingly, defendants may raise plaintiff’s parents’ negligence as a defense to any claim of lead injury during the “post-test/post-inspection period.” As there is no evidence that plaintiff’s parents knew about the danger posed by lead-based paint prior to the blood test and inspection by the County, plaintiff’s motion to dismiss the affirmative defenses alleging parental negligence is granted only to the extent that defendants seek to assert a claim against the parents for plaintiff’s lead exposure during the period between when plaintiff first moved into the Milanos’ apartment and when his parents were notified in May 1989 that his lead levels were elevated and how to eliminate further lead exposure.
*493 Turning next to the County’s motion for summary judgment, plaintiffs claim against the County rests on allegations that the County negligently failed to follow the proper protocols in dealing with the danger posed by plaintiffs lead levels and failed to inform the Milanos of the lead problem thereby allegedly keeping the Milanos from believing that there was a problem and remedying the problem. The court rejects plaintiffs novel argument that Public Health Law §§ 1370 through 1376 impose a special duty on the County to protect the plaintiff and concludes that they merely set forth the authority to act (Bargy v Sienkiewicz, 207 AD2d 606, 607). The statute does not reflect any legislative intent to impose liability on the State or municipalities for citizens’ lead-related complaints simply because they fail to force property owners to eliminate lead hazards.
Mere negligence of the County in its governmental function leading to plaintiffs injury is generally insufficient to state a claim against the County. When a claim is made that a municipality has negligently exercised a governmental function, liability turns upon the existence of a special duty to the injured person, in contrast to a general duty owed to the public (Garrett v Holiday Inns, 58 NY2d 253, 261; Bargy v Sienkiewicz, supra, at 608). Establishment of the requisite special relationship requires plaintiff to demonstrate four things: that the municipality assumed, “through promise or actions” an affirmative duty to act on plaintiffs behalf; knowledge by the municipality’s agents that inaction could lead to harm; some form of direct contact between the municipality’s agents and the plaintiff; and justifiable reliance by the plaintiff on the municipality’s affirmative undertaking (Bargy v Sienkiewicz, supra, at 609).
As movant, the County has the initial burden of establishing a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case (Zuckerman v City of New York, 49 NY2d 557, 560). The County has made its prima facie showing that it owed no special duty to plaintiff, demonstrating that its employees did not promise to protect plaintiff from further lead exposure and actually refused plaintiffs father’s oft-repeated demands that they write to the landlord about the lead paint. Plaintiffs mother concedes knowing within two weeks of the initial inspection that the County would not intervene on their behalf. There could be no justifiable reliance by the parents under these circumstances.
*494 Thus, plaintiff must show facts sufficient to require a trial of any issue of fact in order to defeat the motion (Zuckerman v City of New York, supra). Plaintiff responds with the affidavit of his mother presenting her conclusory statement that she thought the County would take care of her family and relied on the County. These statements are both insufficient and inconsistent with her earlier testimony and fail to provide any evidence that the County assumed “positive direction and control.” In fact, the plaintiff’s mother’s testimony demonstrates the opposite. Accordingly, the court finds that plaintiff has failed to raise a triable issue that would support his claim that the County had assumed a special duty to him and that his parents either actually relied on or could have reasonably relied on the County to perform that special duty. There being no responsibility on the County’s part, there is no need to consider the issue of damages flowing from any lead exposure. The County’s motion for summary judgment dismissing the plaintiffs action against it is granted.
The Milanos’ motion for summary judgment first challenges the constructive notice claim, on the ground that they lacked any notice of the lead-based paint in the plaintiffs apartment until May 1989. “The general rule is that a lessor out of possession is not liable for injuries resulting from the condition of the demised premises, since liability is an incident of occupation and control” (1A PJI3d 464). Plaintiff concedes that the Milanos had no actual knowledge of the presence of lead-based paint prior to his arrival with his parents, but urges that the Milanos were aware of chipping and peeling paint. Mere knowledge of chipping or peeling paint is not sufficient to establish constructive notice of a hazardous lead-based paint condition (Lanthier v Feroleto, 237 AD2d 877).
Although the Administrative Code of the City of New York has been found to impose an obligation on landlords in New York City to search out and remedy lead hazards in their apartments (Juarez v Wavecrest Mgt. Team, 88 NY2d 628), the court rejects plaintiffs imaginative arguments for finding that other State regulations and laws impose a duty on landlords outside of New York City to hire lead specialists equipped with the special equipment needed for testing for lead-based paints to inspect apartments, to constantly monitor apartments for. chipping and peeling paint and to ensure that tenants are sweeping and vacuuming properly, and for imputing knowledge of lead hazards to all landlords. Juarez rests upon a code which imposes a specific duty on landlords to ameliorate lead-based *495 paint hazards as defined by the Administrative Code and grants landlords the right of entry to make the required repairs. The authorities relied on by plaintiff, 10 NYCRR 21.21, Real Property Law § 235-b, and Multiple Residence Law § 174, impose no such obligation. Plaintiff inadvertently illustrates why this is a matter not suited to resolution by judicial fiat and better entrusted to the Legislature, with his comically inconsistent argument that the court must impute knowledge of the lead hazard to the Milanos because “it is well known that paint contains lead which may cause lead poisoning to anyone ingesting it” while also asserting that his parents were completely unaware that allowing plaintiff to eat the very same obviously inedible debris is in any way harmful. Until the Legislature acts to hold landlords liable for the mere presence of lead-based paint regardless of their knowledge, the general rule applies and landlords without knowledge that paint is lead based are not on constructive notice of a lead hazard when they see flaking and peeling paint (Lanthier v Feroleto, supra). Accordingly, the Milanos are entitled to summary judgment dismissing the first cause of action claiming they had constructive knowledge of the lead hazard.
As regards plaintiff’s second cause of action for failure to remediate after actual notice of the lead hazard, the Milanos claim that they acted reasonably in initially rejecting plaintiff’s father’s demand that he be paid by them to buy paint and do the work himself as some kind of scam. The Coopers were on welfare and the Milanos received rent from a social services agency rather than plaintiffs parents. There being no written lease, the Milanos did not have a right to go into the apartment uninvited. Plaintiffs mother acknowledges that soon after the May 1989 conversation between plaintiffs father and the Milanos, plaintiffs parents made it impossible for the Milanos to enter the apartment to remedy the lead hazard by placing new locks on the doors. The Coopers did not remediate on their own and refused to leave the apartment until seven months later during eviction proceedings.
As noted previously, the Milanos and County’s potential liability in the event a special duty was found is limited to injury sustained as a result of lead exposure during the “post-test/ post-initial inspection” period. In addition to disputing that plaintiffs injuries are lead related, the defendants present evidence that the “post-test/post-inspection” exposure of the two-year-old plaintiff is medically insignificant, especially in light of plaintiff’s mother’s statement to Alan J. Barnett that *496 plaintiff was eating paint chips when he was one and the fact that plaintiff’s lead level was at its highest at the time of the May 1989 test. The defendants’ expert states that lead accumulates in the body during exposure and does not immediately disappear after exposure stops. Thus, the expert concludes that even with an episodic increase in lead level the over-all gradual decline in plaintiff’s lead level reflects that plaintiff was exposed to no “medically significant” amounts of lead at the apartment after May 1989.
The plaintiff’s burden in responding is to raise triable issues that the Milanos actually had access to the apartment from the time they received notice until the Coopers were evicted, or that the Milanos were immediately obliged to give plaintiff’s father cash to permit the father to repaint and that plaintiff was injured by exposure to lead during the couple of weeks between when plaintiff alleges his father gave the Milanos this notice and when the Coopers locked the Milanos out of the apartment and refused to leave. Notwithstanding testimony that the Milanos had previously paid for repairs in the apartment, plaintiff has not demonstrated that they had a contractual obligation to do so, or that they had or exercised a right to go into the apartment at any time they chose without first obtaining plaintiff’s parents’ permission. The court rejects the implication that the Milanos had assumed a responsibility for routinely inspecting the apartment for lead hazards. Furthermore, plaintiff’s mother fails to allege that her husband invited the Milanos to come into the apartment to inspect for lead or remediate. She does not deny that he insisted on repainting by himself and never did so, or that he changed the apartment locks making it impossible for the Milanos to ameliorate the lead problem.
The Milanos would have been foolhardy either to give plaintiff’s father cash or to trust him to remediate the lead hazard and should not be held accountable for their initial skepticism of his father’s demand or their refusal to immediately comply with his demand for money. There being no invitation to enter the apartment and repair the Milanos are not liable for failing to do so. The Milanos certainly may not be held responsible for failing to remediate after they were barred from the apartment.
Even assuming arguendo that the Milanos could be held liable for not immediately eliminating the lead hazard by giving plaintiff’s father money when first notified in late May 1989, plaintiff has failed to demonstrate that he was injured by lead *497 exposure during those couple of weeks before the Milanos were barred by his parents. Although Robert Karp, the plaintiffs expert, concludes that plaintiff was exposed to some lead in the apartment and that all of plaintiffs alleged disorders are the result of lead exposure, his analysis is remarkable for the conspicuous failure to distinguish between the toxic effect of lead exposure on one-year-olds and two-year-olds. Karp also fails to distinguish between any lead-related injury plaintiff allegedly suffered prior to discovery of his high lead level, when it was at its highest level, and injury suffered after its discovery, as the lead level generally declined. Karp fails to distinguish between the damage sustained during the year and a quarter of alleged exposure in the Milanos’ apartment when the Milanos cannot be held accountable and the couple of weeks after the notice, at age two. Karp carefully ventures no opinion regarding whether the “post-test/post-inspection” exposure was “medically significant” or harmful to plaintiff, much less whether those couple of weeks of exposure immediately after plaintiff’s father gave notice and before the Milanos were barred from the apartment were “medically significant.” These omissions render plaintiffs claim of injury during the relevant periods completely speculative and insufficient.
The court finds that plaintiff has failed to raise triable issues regarding either the Milanos’ responsibility for lead exposure after they were told of the problem by plaintiffs father or plaintiff’s being injured by medically significant lead exposure during such times as the Milanos could be held liable. Accordingly, the Milanos’ motion for summary judgment is granted.